IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No. 10-022-SLR |
| | ) | |
| QUENTIN STANFORD, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER

## I. INTRODUCTION

On February 23, 2010, a federal grand jury returned an indictment and notice of

forfeiture against defendant Quentin Stanford for possession of a firearm by a convicted

felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  (D.I. 9)  Defendant has moved

to suppress statements made to law enforcement on January 31, 2010.  (D.I. 15)  An

evidentiary hearing was conducted on August 20, 2010.  (D.I. 24)  The matter is fully

briefed.  (D.I. 21, 22, 23)  The court  has jurisdiction pursuant to 18 U.S.C. § 3231.

## II. FINDINGS OF FACTS

Pursuant to Federal Rules of Criminal Procedure 12(d), the following constitutes

the court's essential findings of fact.

1. On January 31, 2010, Wilmington Police Department ("WPD") Master

Corporal Kurtis Crawford ("Crawford")[1] was patrolling alone in a marked WPD vehicle.

---

[1]Crawford has been employed by WPD for approximately 16 years.  (D.I. 24 at 3)
At the time of the evidentiary hearing, Crawford's duties included responding to 911
calls in the 19th radio district, the southwestern side of the City of Wilmington.
Previously, Crawford was a WPD community policing officer assigned to answer

(*Id.* at 5)  At approximately 2:20 a.m., the WPD Communication Center ("WILCOM") broadcast that there was a 911 complaint of a husband beating his wife at 407 Greenhill Avenue, Wilmington, Delaware ("the apartment").  (*Id.*; GX5,)  Crawford, about 8 blocks away, immediately drove toward Greenhill Avenue.

2.  While driving to the scene, Crawford received a second WILCOM transmission stating that an unidentified female had a gun at the apartment.  (*Id.* at 6; GX4)  No additional information about the female's identity was broadcast.

3.  Approximately one minute later, Crawford arrived on Greenhill Avenue, parked his vehicle about two houses away from the apartment,[2] and surveyed the scene.  (*Id.* at 23)  The apartment is located on the residential side of Greenhill Avenue, with a convenience store directly across the street.  (Id. at 7; GX2)  It was not an overly dark evening and Crawford did not see anyone on the street outside the apartment. The illumination from street lights along Greenhill Avenue and inside the apartment enabled Crawford to see that the front door of the apartment was open with a glass storm door closed.  (*Id.* at 22-23)

4.  Crawford exited his police vehicle and stood behind a parked car, about 25 feet from the apartment.  Through the glass storm door, Crawford observed defendant[3] standing on the landing between the apartments.  Although defendant's back faced

complaints, and prior to that assignment was a member of the Mobile Enforcement Team ("MET").  MET goes into high crime areas of the City of Wilmington and attempts, in part, to develop information relevant to violent crimes committed in the area.

[2]A two-story apartment building containing two separate apartments.  (*Id.* at 6-7; DX1)

[3]Crawford identified this individual as defendant.  (*Id.* at 7)

him, Crawford saw defendant talking to someone up on the steps toward the first floor apartment. (*Id.* at 7, 23, 27)  Defendant was wearing a white t-shirt, red sweat pants and was holding a shotgun.  Crawford recognized that the shotgun's barrel had an uneven end and appeared significantly shorter than shotguns Crawford had seen in his training and experience.  According to Crawford, a standard shotgun "has about another seven to eight inches on the end of the barrel" than the shotgun defendant was holding. (*Id.* at 16)  Crawford also surmised that the shotgun barrel had been cut by hand with a hacksaw resulting in an uneven end.  These observations caused Crawford to conclude that defendant was holding a sawed-off shotgun, a destructive weapon prohibited by Delaware law.  Crawford thought that a shotgun with a barrel less than nineteen inches in length constituted a destructive weapon. (*Id.* at 15, 17)

5.  Crawford immediately notified WILCOM that there was a subject standing in the doorway holding a long gun and requested back-up. (*Id.* at 8)  Crawford took a position of cover on the street and waited for back-up units to arrive. (*Id.* 8, 24)  While waiting, Crawford observed defendant walk down into the basement. (*Id.* at 8)

6.  About 30 seconds later, four to five back-up officers arrived. (*Id.*)  Crawford, with his loaded service weapon drawn and pointed toward the basement stairs, approached the apartment, opened the storm door and ordered defendant to come upstairs with his hands showing. (*Id.* at 8-10, 29)  Defendant did not respond to Crawford's commands. (*Id.* at 9)

7.  At that point, defendant's son came out of the apartment and was ordered to sit on the steps.  He complied without incident. (*Id.*)  Crawford again ordered defendant

3

to come upstairs with his hands showing.  After a few more minutes, defendant emerged from the basement, holding nothing in his hands.  (*Id.* at 9-10)

8.  Crawford asked defendant where the shotgun was located.  Defendant denied knowledge of the shotgun, stating he went to the basement to urinate.  (*Id.* at 10, 14)  Crawford placed defendant in handcuffs and secured him in his patrol vehicle.  (*Id.* at 14)

9.  Crawford and several officers went to the basement to investigate.  (*Id.* at 10)  The basement is an open common storage area without doors.  (*Id.* at 10-12)  There were tools and household goods stored throughout the basement.  (*Id.* at 11 - 12)  Following a cursory search, officers discovered what appeared to be a sawed -off shotgun leaning against a wall.  (*Id.*)

10.  Crawford returned upstairs and attempted to speak with the occupants of the apartment.  (*Id.* at 14)  There were three to four females present; all appeared upset and unwilling to speak with Crawford.  (*Id.* at 15, 32)  Crawford thought that the oldest woman was involved in the domestic violence call that was the impetus for his presence at the location.

11.  Crawford returned to his patrol vehicle to transport defendant to the police station.  (*Id.* at 15)  Crawford believed he was arresting defendant for possession of a destructive weapon, a violation of Delaware law.[4]  (*Id.*)  However, even if defendant had not been taken into custody at the scene, Crawford would have still run a warrant check

---

[4]Under Delaware law, a shotgun with a barrel length of 18 inches or less is a "destructive weapon."  (*Id.* at 15-17)

(on the radio) through WPD data center.[5] If a weapon is involved, Crawford testified that it is standard police procedure to run a criminal history check.[6] (*Id.* at 18)

12. Upon arrival at the police station, Crawford placed defendant in turnkey and ran defendant's name and discovered an outstanding capias out of New Castle County Court of Common Pleas. (*Id.* at 16) Crawford then reviewed defendant's criminal history and found that, based on defendant's prior convictions, he was prohibited from owning or possessing any type of weapon.

13. Crawford returned to turnkey to ask defendant if he would consent to being interviewed. Defendant agreed; Crawford administered *Miranda*[7] warnings, which defendant waived. (*Id.* at 16) Defendant stated that he took the shotgun to the basement so that his wife could not get her hands on the weapon. (*Id.* at 16-17, 33)

14. While at the police station, Crawford obtained a tape measure and measured the barrel of the shotgun found in the basement. (*Id.* at 17) The barrel measured a total length of 19 inches within legal limits. Up until that evening, Crawford mistakenly believed Delaware law defined a sawed-off shotgun as having a barrel length of 19 inches or less.

## III. DISCUSSION

### A. Probable Cause to Arrest

---

[5]Presumably discovering the capias. *see infra* para 12.

[6]Presumably discovering defendant's prior convictions. *see infra* para 12.

[7]*Miranda v. Arizona*, 384 U.S. 436 (1966).

1.  Defendant asserts that statements he made on January 31, 2010 should be suppressed as the fruit of an unlawful arrest because law enforcement officers lacked probable cause to arrest him.  (D.I. 15, 22)  Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to lead a reasonable person to believe that an offense has been committed and that the arrested person committed it.  *Beck v. Ohio,* 379 U.S. 89, 91 (1964); *United States v. McGlory,* 968 F.2d 309, 342 (3d Cir.1992).

2.  Whether the police have probable cause for a warrantless arrest is determined by the totality of the circumstances.  *See Illinois v. Gates,* 462 U.S. 213, 230-32 (1983).  The Supreme Court has concluded that probable cause to justify an arrest means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Michigan v. DeFillippo,* 443 U.S. 31, 37, (1979) (citations omitted).

3.  An officer's mistake of fact does not negate probable cause to arrest.  *Illinois v. Rodriguez,* 497 U.S. 177, 185 (1990).  However, "a mistake of law is only unreasonable when the officer does not offer facts that objectively show that the identified law was actually broken."  *United States v. Delfin-Colina,* 464 F.3d 392, 398 (3d Cir. 2006).  To that end,

> an officer's Fourth Amendment burden of production is to (1) identify the ordinance or statute that he believed had been violated, and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction.  As long as both prongs are met, an officer's subjective understanding

of the law at issue would not be relevant to the court's determination.

(*Id.* at 399-400)

4. The record[8] reflects that Crawford responded to Greenhill after receiving information from radio dispatch about a man beating his wife. Shortly after that first radio dispatch, Crawford learned that a female at the location was in possession of a firearm. Upon arrival, Crawford observed defendant standing in the stairwell of the apartment holding what appeared to be a sawed-off shotgun. Crawford then observed defendant enter the basement. Following the arrival of back-up officers, Crawford ordered defendant to come out of the basement with his hands up; eventually, defendant complied. In the basement, officers recovered a shotgun that Crawford, based on his training and experience, believed to be a sawed-off shotgun. Crawford

---

[8]The court is charged with reviewing the "credibility of witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir. 1993); *United States v. Williams*, 400 F. Supp.2d 673 (D. Del. 2005). A "judge engaged in adjudicative fact-finding will apply standards of credibility and proof that differ from the cognitive processes of an officer acting in the field." *United States v. Bonner*, 363 F.3d 213, 219 (3d Cir. 2004) (Smith, J. concurring). The court is in a unique position to assess and evaluate the credibility and demeanor of the testifying witnesses as well as the evidence presented at the suppression hearing. *United States v. Givan*, 320 F.3d 452, 464 (3d Cir. 2003). With these principles in mind, the court considered the live testimony provided by Crawford at the evidentiary hearing against the audiotaped (and written transcript) of an interview ("interview") of defendant's son, conducted sometime following defendant's arrest for the charges at bar. (DX4, DX5) The interview begins with the WPD Detective Steven Parrott stating "I'm here because I want to get your side of things the night your Dad [defendant] was arrested down on Greenhill Avenue, ok?" and continues with Quentin's responses to questions about the events at issue. (DX5; D.I. 24 at 35-38) Because the audiotape was inaudible at various points, the court relied primarily on the transcript. Conversely, because Crawford testified at the evidentiary hearing, the court observed his demeanor, including his responses to both direct and cross examination. Weighing both, the court finds Crawford's statements more credible.

formed this conclusion because the shotgun barrel had been significantly shortened and was about seven to eight inches shorter than the standard shotguns that Crawford had seen in his training and experience.  The end of the barrel also appeared uneven, as if altered by hand using a hacksaw.  Considering these factors in light of the aforementioned authority, the court finds that there was probable cause to arrest defendant for possession of a destructive weapon, a sawed-off shotgun.

5. Moreover, the fact that Crawford misunderstood the definition of "sawed-off shotgun" under Delaware law and eventually determined that the shotgun was not a sawed-off shotgun does not undermine the court's finding.  Significantly, as required by *Delfin-Colina*, Crawford identified the statute he believed defendant had violated and provided credible testimony that could support an objective determination by a prudent officer that a crime had been committed.

**B. Confession Purged from Unlawful Arrest**

1. Assuming that the arrest was unlawful, defendant asserts that his name and criminal history were obtained though the exploitation of that arrest.  And, because there was not a sufficient intervening event to purge the taint of defendant's unlawful arrest, he contends his statements must be suppressed.  (D.I. 22)

2. A "confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) quoting *Brown v. Illinois*, 422 U.S. 590, 602 (1975)).  The Supreme Court has identified several factors

to consider in deciding whether a confession has been purged of the unlawful arrest: (1) temporal proximity between arrest and confession; (2) presence of intervening circumstances; and (3) "particularly, the purpose and flagrancy of the official misconduct." *Taylor,* 457 U.S. at 690. The government carries the burden of demonstrating that a confession is admissible. *Id.*

3.  The record reflects that after transporting defendant to the police station, Crawford discovered the outstanding capias and prior convictions. However, the record likewise reflects that Crawford would have made the same discovery (capias and prior convictions) even if he had not transported defendant to the police station because it was his standard procedure to run a warrant and criminal history check at the scene. Crawford then could have taken defendant into custody for the outstanding capias and/or for possession of a firearm by a person prohibited. This discovery constitutes a sufficient intervening event to any purge taint from the purported illegal arrest.

## IV. CONCLUSION

At Wilmington this 8th day of December, 2010,

IT IS ORDERED that:

1.  Defendant's motion to suppress (D.I. 15) is denied.

2.  A telephone status conference is scheduled to commence on **Wednesday, January 12, 2011** at **8:15 a.m.**, with the court initiating said call.

3.  The time between this order and the teleconference shall be excludable

under the Speedy Trial Act in the interests of justice, 18 U.S.C. § 3161, et seq.


_____
United States District Judge